**GETTY OIL COMPANY, Plaintiff,**

v.

**P. A. MILLS, t/a Moody Engineering Company, Defendant.**

**Civ. A. No. 17189.**

United States District Court
W. D. Pennsylvania.

April 18, 1962.

**180**

David McNeal Olds, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., C. J. Head, Hecht, Hadfield, Farbach & McAlpin, New York City, for plaintiff.

Clyde A. Armstrong, Thorp, Reed & Armstrong, J. Vincent Burke, Jr., Pittsburgh, Pa., for defendant.

DUMBAULD, District Judge.

It is perhaps as true of this case, as it was of litigation in the time of Lord Coke and of Justice Holmes, that protracted cases result by reason of the magnitude of the economic interests at stake, rather than the intricacy of the legal issues involved. In Coke's words, "to say the Truth, many questions are raised rather out of the weight of the Matter, than the Difficulty of the Case: For I never saw any Case of great Value proceed quietly, without many Exceptions in arrest of Judgment." Rep. pt. 10, pref. Holmes said: "Great cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend." Northern Securities Co. v. United States, 193 U.S. 197, 400–401, 24 S.Ct. 436, 48 L.Ed. 679 (1904).

In any event the case at bar, if not a "great case" in the sense indicated by Justice Holmes, is a "protracted case" as dealt with in much recent literature regarding judicial administration.[1] Presentation of plaintiff's case required 38 trial days, during an elapsed time of more than three months, beginning on October 23, 1961, and ending on February 5, 1962, followed by argument for two days of defendant's motion to dismiss which is now before us. Briefs containing over 200 pages were then filed. Three or four lawyers on each side, from prominent Pittsburgh and New York firms, have presented the case with ability and thoroughness. They have received daily transcripts of testimony, amounting to 4665 pages, which the Court has read *in toto* personally, independently of the references contained in the briefs. Fourteen witnesses were heard, and depositions were read of ten witnesses whose employment abroad or illness necessitated receiving their testimony in written form. A lengthy stipulation was also placed upon the record. Multitudinous documents, photographs, charts, test samples cut from pipe, mounted specimens cut from larger samples and etched, "macrophotographs" or enlarged views of the mounted specimens, and diagrams drawn by witnesses on the stand, have been received in evidence. Moreover, several sections of 18 inch diameter pipe, including one complete 40 foot "joint", have been marked as exhibits, and stored in a warehouse, where court has been held in order for witnesses to point out what they observed upon examining the pipe. The weight of the evidence, if measured by avoirdupois as Justice Brandeis did in Baltimore & O. R. R. Co. v. United States, 298 U.S. 349, 381, 56 S.Ct. 797, 80 L.Ed. 1209 (1936), would be colossal.

Justice Holmes, in the antitrust case previously quoted from, asseverated that the issue whether competition had been eliminated between two transcontinental railroads should be decided "as if the question were whether two small exporting grocers should go to jail." 193 U.S. at 402. The vast continuum of the case at bar, "when we wash it with cynical acid",[2] similarly shrinks to manageable proportions upon being subjected to legal analysis. We shall consider it as if the question were whether an inspector employed by the proprietor of a grocery store to inspect canned goods or bottled beverages at the cannery or bottling plant would be liable in damages because the can or bottle exploded when a customer took it from the grocer's shelves. See Loch v. Confair, 372 Pa. 212, 216–218, 93 A.2d 451 (1953); Braccia v. Coca-Cola Bottling Co., 398 Pa. 386, 388, 157 A.2d 747 (1960). The issue in the case at bar, simply stated, is whether defendant is responsible for the enormous [3] losses sustained by an oil company when pipe inspected by de-

---

1. Handbook of Recommended Procedures for the Trial of Protracted Cases, Adopted by the Judicial Conference of the United States, March, 1960, 23–25; Breck P. McAllister, "The Big Case", 64 Harv. L.R. 27 (1950).

2. Holmes, Collected Legal Papers, 174 (1920).

3. Plaintiff claims over a million and a half dollars as damages (Tr. 3487, 3554). This amount includes (1) cost of the pipe; (2) cost of inspection of the pipe by defendant; (3) cost of transporting the pipe to the pipe line site; (4) cost of constructing the pipe line; (5) cost of repairs to the line in attempting to make it serviceable. There is undoubtedly a quantity of "water" (or should we say "oil"?) in this claim For example it includes overhead expenses such as the total amount of the salary of the oil company's superintendent, on the theory that he spent all his time during the period covered working on the pipe line (Tr. 3530). But the superintendent's salary would have to be paid in any event, whether defendant were negligent or not in inspecting the pipe. Likewise plaintiff claims travel expenses of its lawyers preparing the case (Tr. 4490–91), and freight for 16 inch pipe (Tr. 3977), which did not prove unserviceable (Tr. 1430, 4458, PT–27). Accordingly, the Court urged the parties, during a recess, to reevaluate their respective contentions more realistically with a view to reaching a settlement of the case, but with no results (Tr. 3531, 3955).

fendant at a manufacturing plant in Germany proved unsatisfactory, sustaining numerous ruptures and leaks, when used in a 31 mile pipe line constructed by plaintiff to transport oil to the Persian Gulf.

Subsidiary questions are: (1) What was the scope of the inspection which it was defendant's duty to make? (2) Did defendant properly discharge this duty? (3) If not, was defendant's conduct negligent towards plaintiff (between whom and defendant there was no privity of contract)? (4) If so, was defendant's negligence the proximate cause of plaintiff's loss?

To resolve these questions we shall now review more minutely the contentions and evidence adduced by plaintiff regarding these points. It will be helpful first to summarize the basic facts concerning which there is little controversy.

### Basic Facts

Plaintiff, Getty Oil Company (formerly Pacific Western Oil Company), is an American company producing oil under a concession in the Neutral Zone between Kuwait and Saudi Arabia (Tr. 1389, 2389, 2391–92, 4092–93). The wells are in the vicinity of Wafra, and the refinery and marine terminal at Mina Saud, near the port of Khor El Mufatta, on the Persian Gulf (now called Arabian Gulf). A 31 or 32 mile ten inch transmission line was constructed of seamless pipe in 1954 between those points. The grade descends 500, or 520, or 550 feet in that distance (Tr. 1391, 2396, 4089, 4102, 4181). That ten inch line was built generally parallel to a satisfactorily working line built by Aminoil, another producer (Tr. 2882). There was also an eight inch line of seamless pipe used for gas (Tr. 2440).

The line here involved, of 16 and 18 inch pipe, was built in 1957. It was laid generally parallel to the ten inch line. No engineering designs were used (Tr. 2525, 3058), the senior official of Getty Oil Company believing that an engineer is really not needed except for the first line to be built (Tr. 4092, 4252, 4254, 4258).

Early in 1956 additional transmission facilities were urgently needed, but there was a shortage of pipe in the market (Tr. 4138, 1299). Some 40 or 50 contacts were made by Getty's affiliate company (Tidewater) in the attempt to obtain suitable pipe (Tr. 1306). On August 17, 1956, a broker known as Tex-Tube, Inc., of Houston, Texas (hereinafter called Textube), offered 32 miles of 16 inch spiral weld pipe of .355 inch wall thickness, to be manufactured at a German mill (Tr. 1300; ST–1). This offer was accepted by cable, but the producer was unable to obtain the necessary steel (called "skelp") to honor the order (Tr. 1307; ST–3, 5, 8, 9).

Meanwhile Textube requested defendant to report on the ability of the German company (Rohrenwerk Castrop, located at Castrop-Rauxel, near Duesseldorf) to produce "acceptable pipe" (ST–7). On September 29, 1956, defendant sent a favorable report to Textube (ST–11), which was received on or before October 1, 1956 (ST–12). On October 10, 1956, G. M. Dixon of Tidewater ascertained from the Bechtel Company, another engineering firm, that Castrop "was a reliable concern" (D–6).

In defendant's report he pointed out that both spiral-welded pipe and pipe made by the submerged-arc welding process were not standard pipe recognized in the American Petroleum Institute Standard 5L. (A copy of API–5L is in evidence as Ex. 13, Mills deposition; D–188. Tr. 299, 317).

Defendant also pointed out that "unquestionably there will be portions of the spiral seam having the outside weld bead only that will not be fully penetrated. * * * Therefore, if a spiral weld can also be applied to the inside of this pipe, it will undoubtedly be a better product." Defendant received $105.90 for making this investigation (ST–13).

On October 10, 1956, Textube again made an offer to Tidewater of 32 miles

of 16 inch pipe of .315 inch wall thickness (ST–14). This was accepted on October 12, 1956, in pursuance of cabled authority from J. Paul Getty, although he thought the price was high (Tr. 1621; TD–33; ST–20, 21–A). The written purchase order from Getty Oil Company to Textube (ST–22) contained this language:

"All in accordance with attached specifications. \* \* \*

"Mill inspection by Moody Engineering Co. as follows:

"Full chemical and physical testing and inspection in accordance with the requirements of API Standard 5 L except as modified by the above pipe specification. Special attention shall be given to securing spiral welds of first class quality, in conformance with specification Paragraph 3–A, through examination and control of welding procedures, visual examination, Tensile Tests and spot examination of weld sections. Both end-roundness and dimensional requirements shall be strictly enforced."

Paragraph 3–A referred to reads as follows:

"In lieu of a longitudinal seam, a single spiral seam shall be employed, utilizing any type of submerged arc fusion welding generally recognized as sound practice. The edges of the plate strips to be welded together to form the spiral seams shall be properly prepared in accordance with the seam welding process employed. Seam welds shall be uniform in cross-section, sound, free of gas pockets and slag inclusions, shall have no undercutting below the outside surface of the parent metal, and shall be of full penetration at all points with good fusion at the root. At no point shall the weld surface be

below the outside surface of the parent metal nor shall it rise above the latter more than $\frac{3}{32}$-inch. Finished lengths of pipe shall permit the passage of a drift or reamer $\frac{3}{16}''$ less in diameter than the computed inside diameter, 15.37 inches, of the pipe."

The above language of the purchase order, as well as the attached specifications (ST–23), had been prepared by Allan L. Piper of Tidewater (Tr. 1308, 1339–43), who had in mind various purposes which he outlined in his testimony, in order to assure a satisfactory product (Tr. 1333, 1338–39, 1341–43, 1490–91).

However, that language was omitted at some stage in the so-called "daisy chain" [4] before it reached defendant or the producing mill (Tr. 1360–70).

The language appeared in Textube's order placed on October 30, 1956, with The Crispin Company, of Houston, Texas (ST–24); but was omitted from Crispin's order placed with Intercontinental Enterprises (ST–25), and from Intercontinental's order of October 18, 1956, placed with the Castrop mill (ST–26).

The language was likewise not contained in Crispin's letter of November 28, 1956, pursuant to which defendant was engaged to inspect pipe at the Castrop mill (ST–33). That letter provided, in pertinent part:

"Inclosed please find specifications of the subject order which \* \* \* is to be manufactured by Rohrenwerk Castrop G m b H, 117 Wartburgstrasse, Castrop-Rauxel, Germany.

"We would appreciate your performing the inspection of this material in accordance with the specifications of the order and preparing your certificate in sextuple \* \* \*."

---

4. The parties use this term to designate the series of intermediaries through which the order (and subsequent change orders) passed, from Getty Oil Company to Rohrenwerk Castrop, the manufacturer of the pipe. Getty's purchase order No. 206 was placed by Tidewater with Textube; Textube placed its purchase order with The Crispin Company, of Houston, Texas; Crispin placed its purchase order with Intercontinental Enterprises Ex-und Import G.m.b.H.; Intercontinental placed the order with Castrop.

Defendant acknowledged Crispin's letter on January 22, 1957 (ST–34), and pointed out that the original specifications had been completely superseded by Change Order No. 1 (ST–32). This had been done in order to meet the changes in the Getty specifications upon which the Castrop mill insisted (ST–29, 30, 31).

Defendant wrote on January 22, 1957, to George L. Leibold, his senior inspector, giving instructions for the inspection (ST–35, 36). A week later he wrote: "we definitely want you to pass judgment on the first quantity of this pipe, as we are rather fearful about it here." (ST–37). [See also ST–54].

The purchaser's representatives also had misgivings regarding the quality of single-pass spiral-welded pipe, but ordered it because it was the only kind available and believed that it would be satisfactory if manufactured in accordance with the specifications (Tr. 1517–23, 1699, 4142–45, 4197–98, 4206).

Later, at the suggestion of J. Paul Getty, the dimensions on the remaining part of the order were changed from 16 to 18 inch diameter, with no change in wall thickness (ST–45, 46). This resulted in Change Order No. 2 (ST–51–A, 51–B, 51–C, 51–D, 51–E–1, 51–E–2).

After performing inspection, as outlined in the testimony of witnesses Shipley, McNally, and the deposition of senior inspector Leibold, certificates were issued by defendant, signed by the inspectors doing the work (ST–52). A report was also sent to Crispin on December 10, 1957 (ST–62).

These certificates were among the documents upon the basis of which an irrevocable letter of credit established by plaintiff, pursuant to the terms of sale, was disbursed by the Chase Manhattan Bank in New York (Deposition of Friburg, Tr. 1384).

The pipe was shipped from Castrop-Rauxel to Antwerp, thence by sea to Khor El Mufatta. Ten inch pipe was "nested" in the eighteen inch pipe to save freight (Tr. 4073). On arrival the pipe was lifted by hooks in the end of the pipe and stacked (Tr. 2890). The ten inch pipe was pulled out, and the pipe trucked to the pipe line site and rolled off the trucks (Tr. 2953, 2989, 3034–44). Defendant contends that the pipe may have been injured, after inspection in Germany, by reason of handling in transit and during the construction of the pipe line.[5]

Defendant also draws attention to the lifting of the pipe onto concrete "sleepers" (supports similar to railroad cross-ties to hold up rails), and to the replacing it in the same manner when it fell off the sleepers by reason of expansion and contraction due to temperature changes in the desert (Tr. 3047–50, 3072; D–61).

Plaintiff's superintendent in the Neutral Zone testified that the ends of the pipes did not fit together properly. This added to the expense of constructing the line. Construction began on September 4, 1957, and ended on October 23. The first testing was on November 15. The line would not even hold water, simply under gravity, without any pump pressure (Tr. 2407, 2435). Representatives of the Castrop mill visited the pipe line and suggested methods of improving the construction. At one point in the discussion, J. Paul Getty agreed to accept the pipe if a pressure of 600 lbs. could be maintained without a break (D–80). Defendant contends that Castrop succeeded in this endeavor, and that this subsequent "accord and satisfaction" with the manufacturer relieves defendant of any liability arising from the antecedent inspection (Tr. 44–46). Numerous ruptures and leaks occurred in the line, nearly always in the spiral welds, rather than in the metal "skelp" of the pipe, or at the field welds (Tr. 2006, 2660, 3026).

On October 8, 1958, the line ceased to be used to transport oil (Tr. 1396). The

5. To some extent Mr. Getty admitted that the pipe had not been properly handled, and was critical towards his subordinates in the Zone (Tr. 2562–64, 2559, 2587–88, 2591–92; D–61).

pipe line has never been adequate for its intended purpose of transmission of oil under pressure. The unserviceable pipe still lies on the desert sands, much of it unraveled along the spiral weld seams.

Plaintiff subsequently constructed a new 16 inch line, using seamless pipe, and employing an engineering firm (Bechtel) to design the line (Tr. 1563, 3008, 4254, 4258).

On November 29, 1957, plaintiff notified the Castrop mill and Textube that the pipe was defective and that they would be held liable (ST–68, 69). On the same date defendant was similarly notified, since "we are advised that your inspection of the pipes and acceptance thereof may preclude us from any remedy against the seller or manufacturer" (ST–70). Defendant replied on December 10, 1957 (ST–71), repeating its opinion that "we have little confidence in or respect for spiral welded pipe which is made with a single pass submerged-arc weld."

Defendant also asserted in that letter its contention that it is the responsibility of the manufacturer to comply with the specifications, and that the inspector's duty is merely to make a visual inspection of the finished product, not to police the manufacturing process.

### Plaintiff's Legal Theories

Plaintiff advances a threefold claim: (1) Based upon defendant's negligent inspection; (2) Based upon fraud or deceit in issuing certificates of inspection; (3) Based upon the theory of contractual liability of defendant as "agent" for plaintiff, or upon the theory that plaintiff was third-party beneficiary of defendant's contract with Crispin.

█ Only two and a half pages of plaintiff's 84 page brief deal with the second and third grounds of relief, and in our opinion that proportion fairly represents the merits of the contention. We are prepared to eliminate those issues from the case immediately. We conclude that there is no evidence to support a recovery on either of those theories. In any event, the facts relied upon to support such a recovery would be the same as those alleged to constitute negligence. The real issue in controversy is whether defendant's inspection was negligent.

Perhaps a word should be said on the matter of fraud and deceit. The contention here is that the pipe did not meet specifications; that the defendant's inspectors, when signing the certificates stating that it did, knew that such certificates were false or knew that they really had no knowledge whether the statements in the certificates were true or false.

This argument assumes the correctness of plaintiff's theories regarding the scope of defendant's duties in connection with the inspection, concerning which we shall have more to say under the heading of negligence. However, to constitute fraud it would be necessary to assume that the inspectors knew that plaintiff's theories as to the scope of their duties were correct, and with such knowledge and with knowledge that they had not performed such duties nevertheless signed the certificates. So long as the inspectors performed in good faith what they believed to be their duties and had no knowledge of any delinquencies on their part in concealing any defects which they had actually detected, we do not think that a valid charge of fraud can be made.

There is no evidence of any actual fraud or bad faith on the part of defendant's inspectors. The contention amounts to no more than that they did not do all that plaintiff thinks they might have done in order to better inform themselves concerning the quality of the pipe they were inspecting.

█ With regard to one matter (the presence of skelp welds within five feet of the ends of a joint of pipe) there is perhaps some indication that the inspectors signed the form of certificates desired by the bank as blithely as government employees signing the anticommunist oath which is a condition prerequisite to getting their pay checks (ST–47–

50, 51–J, 51–K, 61, 65). According to a statement by defendant, the manufacturer shipped some pipe which had been rejected by the inspectors because of skelp welds within 5 feet of the end of a joint (ST–71). It is possible that such shipments were approved by Mr. Getty, who had authorized the shipment of pipe with skelp welds when such pipe had been rejected *in toto* and the manufacturer threatened to increase the price if such pipe were not accepted (Tr. 2754; ST–47, 48). Since Mr. Getty elected not to testify in this case, the rule applies that an inference may be drawn that his testimony would not strengthen plaintiff's case. Haas v. Kasnot, 371 Pa. 580, 584–85, 92 A.2d 171 (1952); Mammoth Oil Co. v. United States, 275 U.S. 13, 51–52, 48 S.Ct. 1, 72 L.Ed. 137 (1927). In any event no harm resulted to plaintiff by reason of shipment of skelp welds, since the ruptures in the line were in the spiral welds, not in the skelp welds (Tr. 3897). There would therefore be no proximate causation of injury to plaintiff even if there were any irregularity imputable to defendant with respect to skelp welds. Hence we dismiss from the case the plaintiff's two supplemental theories, and continue consideration of the issues arising on the basis of negligence.

### *Scope of Defendant's Duty to Inspect*

█ In the early stages of the case plaintiff contended that nothing in defendant's contract or in the specifications limited defendant's duty to making a so-called "visual inspection", which defendant earnestly contended was the limit of his duty (Tr. 70, 149–50, 597, 671). Plaintiff's contention would have been persuasive had the original language prepared by Mr. Piper regarding examination and control of welding procedures (ST–22, supra) been included in the arrangements between Crispin and defendant. But, as has been noted earlier, this language disappeared somewhere along the "daisy chain", before reaching defendant or the producing mill (Tr. 1360–70). It is not clear why this occurred.[6] Perhaps it was another of Mr. Getty's private deals to reduce the cost of the pipe, though we do not have the benefit of his testimony. In any event, Mr. Piper's language did not form part of defendant's contract with Crispin.

Inasmuch as no specific directions were contained in defendant's contract with Crispin, defendant's obligation was merely to perform "inspection of this material in accordance with the specifications". How is this language to be interpreted?

Under the circumstances, it seems reasonable to interpret it in the light of prior dealings between the parties to the contract. Defendant Mills testified that during 1951–1956 his firm had made fifty or sixty inspections for Crispin (Tr. 502), and that it was customary in making these inspections, and customary in the trade generally, to make a visual or surface inspection of the finished product (Tr. 561, 671, 700, 703, 2333, 2347–48). According to defendant, issuance of his certificate merely means that the pipe has passed an inspection of the usual type (Tr. 2347–48). It is not a warranty by defendant that the manufacturer has completely complied with the specifications in every respect. It means only that upon a reasonably careful inspection conducted in the manner customary in the industry no defects warranting rejection of the pipe have been discovered.

As a witness, the defendant Peter A. Mills impressed us as being well-informed, intelligent, exact, precise, truthful; but quite *hartnaeckig* and perversely bel-

---

6. For that matter, it is not clear why there was a "daisy chain" at all. Apparently each company simply dealt through accustomed channels. There is no evidence that there was any course of self-dealing such as that described in Mammoth Oil Co. v. United States, 275 U.S. 13, 47–48, 48 S.Ct. 1, 72 L.Ed. 137 (1927). Nor was there any occasion for inflating the cost basis of a regulated public utility. See Interstate Natural Gas Co. v. Federal Power Commission, 331 U.S. 682, 693, 67 S.Ct. 1482, 91 L.Ed. 1742 (1947).

licose towards opposing counsel on cross-examination. (Those who remember the sharp tongue and acidulous manner of the late Professor Manley O. Hudson, former Judge of the Permanent Court of International Justice, and will try to imagine him undergoing cross-examination,[7] can visualize how it was when Mills was on the stand). After the cantankerous chaff is sifted out, we accept the testimony of Mills as trustworthy.

We therefore accept defendant's interpretation of the contract as correct.

This conclusion is confirmed by the circumstance that plaintiff has offered no contradictory testimony as to standard industrial practice. Indeed, it is noteworthy that plaintiff has offered no proof at all regarding established usage with respect to commercial inspection of pipe.[8] As will appear subsequently, plaintiff's expert witnesses were not commercial pipe inspectors but from the field of research, laboratory investigation, and Navy usage. These witnesses described what in their opinion inspectors should have done, rather than what commercial inspectors in mass production work ordinarily do (Tr. 1346–56, 1796–1807, 3725–29). We conclude that the contract calls for nothing more than the customary type of visual inspection of the finished product. Custom or practice in a particular business is an important factor in determining the standard of due care.

Jemison v. Pfeifer, 397 Pa. 81, 86, 152 A.2d 697 (1959).

Even if defendant's duty was merely to make a customary visual or surface inspection of the finished product, rather than to police the manufacturing process, defendant could be guilty of negligence if such inspection were not properly performed. Whether the inspection was properly performed is the main issue for decision. Before considering it in detail, we shall say a few words regarding the less difficult questions whether defendant's improper performance (if it exists) constitutes negligence towards plaintiff and whether it was the proximate cause of plaintiff's pecuniary losses.

We are convinced that the lack of privity of contract between plaintiff and defendant does not absolve defendant from tort liability to plaintiff if the inspection were negligently performed. Such privity is no longer required, since the epoch-making decision pronounced by the renowned Justice Cardozo, while serving on the highest court of the State of New York, in McPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A. 1916F, 696 (1916). This was proclaimed as the "modern rule" by the Third Circuit Court of Appeals in Diesbourg v. Hazel-Atlas Glass Co., 176 F.2d 410, 411 (C.A.3, 1949), and is the rule in force in Pennsylvania. Foley v. Pittsburgh-Des Moines Co., 363 Pa. 1, 31, 68 A.2d 517 (1949). It is also the law of Germany (Tr. 3374).[9]

7. "State Department! What's that? Never heard of it. Oh, do you perhaps mean the Department of State?"

8. The closest thing to such proof which plaintiff offered was the testimony of the witness Lattan (Tr. 2221), which did not differ significantly from defendant's description of customary practice in the industry.

9. The Pennsylvania conflict of laws rule refers to the place of the tort. Mike v. Lian, 322 Pa. 353, 356, 185 A. 775 (1936); Openbrier v. Gen. Mills Inc., 340 Pa. 167, 169, 16 A.2d 379 (1940); Diesbourg v. Hazel-Atlas Glass Co., 176 F.2d 410, 411 (C.A.3, 1949); Moran v. Pittsburgh-Des Moines Steel Co., 166 F.2d 908, 910 (C.C.A.3, 1948). Possibly the place where the damage was suffered was the Neutral Zone. There is no evidence what law is in force there. Plaintiff contends New York law governs, as that is where its money was paid. But a company such as plaintiff, doing a world-wide business, and having banking connections in many financial centers, should not be able to control the law applicable to its tort litigation by selecting the place of making payment for purchases. When the irrevocable letter of credit was set up, plaintiff parted with its control over the funds so set aside; and the final step in perfecting plaintiff's loss or damage was the issuance, in Germany, of defendant's certificates of inspection. We therefore conclude that the German tort law governs.

Plaintiff is also within the orbit of danger which is the orbit of duty, as enunciated in another notable Cardozo decision followed in Pennsylvania. Palsgraf v. Long Island R. R. Co., 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253 (1928); Helm v. South Penn Oil Co., 382 Pa. 437, 442, 114 A.2d 909 (1955). This doctrine likewise prevails under German law (Tr. 3370).

Whether defendant's negligence, if any, was the proximate cause of plaintiff's loss, and if so to what extent, is a question that may be put aside at the present time as premature. As previously indicated,[10] the amount of damages claimed by plaintiff is obviously somewhat inflated, and would present numerous fact questions regarding particular items which would require further consideration, and perhaps additional testimony, before a proper determination could be made.

In the present connection it is only necessary to notice defendant's contention that plaintiff's case affirmatively discloses that plaintiff's loss was caused by plaintiff's own acts of contributory negligence, in that: (1) Plaintiff used spiral-welded pipe for a type of service to which it is unsuited; (2) plaintiff constructed its pipe line improperly and without proper engineering advice as to design and construction; (3) plaintiff used single-pass spiral-welded pipe in spite of defendant's admonition that double-pass would be better; (4) plaintiff failed to take proper precautions in preparing the specifications for the pipe; (5) plaintiff failed to disclose to defendant or to the manufacturer the use to which the line pipe purchased was to be put; (6) plaintiff failed to take proper precautions to prevent damage to the pipe during transportation and handling.

It is quite likely that some or all of these factors would tend to defeat or diminish the amount of plaintiff's recovery, if any; but since with respect to contributory negligence the burden of proof is on the defendant it would be premature to resolve definitively these controverted issues of fact on the basis of plaintiff's evidence alone, since the question of determining the amount of damages is not before us until the issue of liability is first disposed of.

We therefore turn to the question whether plaintiff has offered sufficient proof to justify a conclusion of negligence on the part of defendant by the trier of fact.

### Plaintiff's Evidence

We shall now outline briefly the plaintiff's evidence. First, two of defendant's four inspectors at the Castrop plant, Louis E. Shipley and Joseph T. McNally, were called and described what they had done in inspecting the pipe. Defendant Peter A. Mills was interrogated at length concerning inspection procedures, and the deposition of George L. Leibold, the senior inspector on the job, was also received. This testimony showed, in essence, that dimensions of the pipe were tested with gauges, and that as each joint was "rolled" along rails above the ground, the inspectors observed externally the entire length of the weld seam from one end of the pipe to the other. They also looked in at the open ends of the pipe and by means of a light observed what they could see of the internal appearance of the weld seam. In their presence Castrop employees "drifted" the pipe, i. e. tested the internal dimensions by inserting a cylinder almost but not quite the size of the inside of the pipe. Occasionally the inspectors would witness tensile tests performed. Leibold reviewed the data from such tests and sent it on to defendant's office in Pittsburgh where it was further reviewed. The other inspectors did not examine the test data, but after making their own visual inspection of the pipe signed certificates without knowing the contents of the test data (Tr 184, 234). However, the test data did not disclose any reasons for rejection of pipe.

Plaintiff's contention is simply that the tests were "too good to be true" and that

---

10. In note 3, supra.

the inspectors should have demanded additional tests and should have carefully policed the performance of the same. By examining the broken test specimens it is argued that they could have gotten further information as to the appearance of the interior cross-section of the weld, and could have been more alert to suspect the presence of defects not visible from the outside of the pipe and could have demanded additional tests to confirm or disprove their suspicions. Undoubtedly additional inspection procedures might have proved desirable, but it seems clear that defendant's inspectors did perform such inspection as the contract with Crispin required, in the light of custom and practice.

Plaintiff called Rollo Lincoln, of Pittsburgh Testing Laboratories, who reported on laboratory tests which he had made on specimens of pipe from the so-called "McNair samples". Lincoln was attempting to determine the cause of failure of the pipe in service, rather than whether it would pass inspection (Tr. 1232). He found lack of fusion in the spiral weld (Tr. 1124). That means failure of the two edges of the "parent metal" or "skelp" to melt and fuse with the added "weld metal" as a result of the heat from the electric arc as the "arc puddle" or "pool" moves along the spiral seam.

It may be useful to note here that besides lack of fusion the other principal defect in the pipe was lack of penetration, i. e. failure of the weld metal to go down to the root of the weld, so as to be equal in thickness to the full thickness of the pipe wall (Tr. 1162). If the weld metal is of the same properties as the skelp, the weld should be as strong as the rest of the pipe. If the actual fused part of the weld, however, does not penetrate to the full thickness of the skelp the pipe is weaker where that condition exists, as it is the equivalent of a thinner pipe wall (Tr. 1333). Also if there are notches at the root of the weld, stress is concentrated and rupture is facilitated (Tr. 1134). Porosity and slag inclusion

are other defects which contribute to the poor condition of spiral welds.

Defendant duly objected to Lincoln's testimony because it was based upon the McNair samples. McNair was a Getty employee whose deposition showed that at the request of counsel he had looked for examples of defective welds and selected samples from joints of pipe lying abandoned along the pipe line (but which he believed had ruptured while in the line and had been replaced), and from an unused joint in stock at the Mina Saud pipe yard which bore the Moody inspection symbol (Tr. 1406, 1426, 1428–30, 1439–42, 2041–42). Of course this would not constitute a proper statistical sampling for the purpose of showing that these samples were typical of all the pipe inspected by defendant. Pritchard v. Liggett & Myers Tob. Co., 295 F.2d 293, 301 (C.A.3, 1961); Handbook of Recommended Procedures for the Trial of Protracted Cases, 71–76.

Allan L. Piper, of Tidewater, who prepared the specifications, explained the course of negotiations leading up to the purchase of Castrop pipe. The subsequent modification of the language recommended by him regarding inspection, before defendant's contract with Crispin was entered into, has already been discussed.

Bela Ronay, retired chief of a welding laboratory of the United States Navy, described the technical features of welding and the type of inspection program he considered advisable. The Court regarded this witness as an experienced and trustworthy expert. As has been previously stated, however, defendant's contract did not call for all the precautions which Ronay regarded as proper, and which would perhaps be indispensable in work with boilers or for the Navy. (The tendency of contractors or suppliers to take advantage of the government is notorious. See United States v. Bethlehem Steel Corp., 315 U.S. 289, 62 S.Ct. 581, 86 L.Ed. 855 (1942). Strict inspection is a necessity also for reasons of safety in work of the type which Ronay was accustomed to handling.)

Defendant contended that Ronay's testimony should be excluded because his expertise was in the field of naval or boiler welding, rather than the field of pipe welding (Tr. 1722, 1726, 1734, 1936). The trial Court's ruling was that insofar as the same general scientific principles might apply to both fields, the testimony might be pertinent, and that the objections went to its weight, not to its admissibility. A weld is a weld is a weld? The witness himself said that there was no difference in the scientific principles applicable (Tr. 1818). Of course, if the Court's rulings on admissibility are erroneous, the quantum of evidentiary support for plaintiff's case is correspondingly reduced.

J. E. Lattan of Taylor Forge Co., a manufacturer of pipe of a different sort than that involved in this case, then testified. His testimony has been discussed elsewhere.

William J. Scott and George Gordon described at some length the construction of the pipe line and the defects experienced in the pipe. They were employees of Getty Oil Company located in the Neutral Zone and in charge of the pipe line project. Their testimony enumerated the large number of leaks and ruptures in the line, which took place at the factory-applied spiral weld seams. Defendant contends that they had been criticized by Mr. Getty for mishandling the pipe and for lack of engineering plans in construction of the line, and that they were desirous of getting themselves "off the hook" by pointing the finger at the Moody inspection as the culprit.[11] There is some basis for this argument (D–61, D–75, D–83, TD–40), but we accept their testimony as unquestionably establishing the fact that the 18 inch pipe line was not serviceable because of ruptures and leaks occurring in the defective welds.

Gordon, as well as the next witness, Professor Roy B. McCauley of Ohio State University, commented on a joint of pipe in the Pitt-Penn warehouse, pointing out defects. McCauley also testified as to laboratory tests made by him on the McNair specimens, and also upon specimens from three pieces of pipe which he himself selected during a three-day visit to the Neutral Zone, in the course of which he rode along the pipe line in a truck, took photographs, and conducted a hydrostatic test. He also visited the Castrop plant. He outlined a program of inspection which he considered desirable.

Defendant attacks with some plausibility the credibility of McCauley as an evasive and hostile witness. The point is also made that his experience was in the gas industry rather than the oil industry. The witness himself regarded the fields as comparable (Tr. 3742–45). The same questions arise as in the case of Ronay. We consider McCauley to be a glib and rather partisan witness,[12] but credible when corroborated by Ronay.

11. Gordon did not see the specifications until after the pipe arrived. Apparently he thought that the Piper language in the purchase order was part of the specifications (Tr. 2898–99). His inquiry of September 17, 1957, as to the scope of Moody's inspection service was apparently never answered (D–79–1–B). Gordon's progress reports were prepared in anticipation of litigation and are probably self-serving rather than routine business entries (Tr. 2417). See Palmer v. Hoffman, 318 U.S. 109, 113–114, 63 S.Ct. 477, 87 L.Ed. 645 (1943).

12. The following passage from McCauley's testimony (Tr. 3247) reminds one of Polonius in Hamlet: "very like a whale" or of the Walrus and the Carpenter: "And that was queer because they haven't any feet":

"MR. ARMSTRONG: Pardon me, Mr. Olds. What is that line in the left of 267, if it is a line?

"THE WITNESS: I think it is.

"THE COURT: It could be a freight train passing.

"THE WITNESS: From the best of my recollection, it could be a freight train, sir, although, of course, there are no rail lines there. I would just hestitate to say, Mr. Armstrong. I didn't look very closely. I presume it is a pipeline. I don't recall. I would have to see a shot

No other significant testimony was offered on the question of liability. Martin Domke appeared as an expert on German law. C. Norman Murray furnished computations as to the hour of sunrise at Duesseldorf to impeach the credibility of the inspectors who said it was dark when they left to go to the Castrop plant. The deposition of Walter F. Scott and the testimony of William J. Evans and Wallace W. Mitchell related to the issue of damages. Data from the company's accounting records were adduced to show that the cost of constructing the pipe line (including pipe, defendant's inspection charges, transportation, and construction) amounted to approximately $1,782,989.27 (Tr. 3487), or $1,899,075.10 (Tr. 3554). Another computation fixes the figure of the pipe at $1,047,142.70 (Tr. 4031), and defendant's charges at $9,845.75 (P–147) or $10,074.23 (P–144).

### Plaintiff's Contentions

Plaintiff contends (Brief, 27–28) that it was defendant's obligation "to (1) investigate and determine the general industrial competence of Castrop, (2) establish a workmanship standard for the spiral weld seam meeting the requirements of para. 2(a) of the Specifications, (3) conduct a careful physical examination of the exterior and interior of the pipe, (4) participate in the physical testing to the extent necessary to assure the inspector of its proper, honest and accurate performance and reporting, and to obtain the advantage of a close examination of the test specimens, (5) control repair of weld seam defects to insure proper repair, and (6) control the affixing of the acceptance stamp and the separation of rejected pipes from accepted pipes so as to prevent shipment of defective material."

As to the first point, we think that it is rather the obligation of a prospective purchaser than of an inspector, to determine whether the type of product ordered is satisfactory and whether the producer is a satisfactory source of supply. In any event, defendant's preliminary examination of the plant, which plaintiff's purchasing representatives seem to have regarded as sufficient, would constitute adequate compliance with such a prerequisite. We consider that examination a wholly separate transaction (between defendant and Textube), entirely unrelated to the pipe inspection job which defendant undertook under its contract with Crispin. There was no duty upon defendant to reappraise, in the capacity of inspector, the general industrial competence of Castrop.

As to the second point, plaintiff makes an impressive showing that it would be desirable for the inspection service to include a test run, in order that the inspectors might be familiar with the *modus operandi* of the welding machine, and its probable aberrations, and in order that they might learn to correlate the exterior appearance of satisfactory welds with the interior. In that connection it is urged that they should take advantage of the tensile tests to obtain a view of the interior cross section of the weld seam [see point (4)].

At considerable length the witness Ronay, an experienced and conscientious laboratory chief concerned with boilers and other construction for naval vessels, outlined a program of the type of inspection he considered advisable (Tr. 1796–1807). Likewise Professor McCauley of Ohio State described what he considered appropriate (Tr. 3725–29).

Ronay's program contemplates monitoring the process of manufacture, including, for example, precautions against moisture in the flux or irregularities in its rate of flow. (Tr. 1772, 1777, 1780, 1781, 1790–93, 1803).

Undoubtedly this type of inspection would be desirable. In the case of boilers or navy equipment such procedures may even be indispensable. Other testing

---

of the whole area. In this area, there are other lines about. It is rather difficult to say. I would hazard a guess that

it is possibly another pipeline—maybe the 8, 10, or 16—but this is only a guess, sir."

methods such as X-ray or fluoroscopic or magnetic flux examination may also be required. But less exacting standards are in vogue with respect to pipe (Tr. 1219). Mr. Piper originally recommended special inspection requirements calling for "examination and control of welding procedures" and "spot examination of weld sections". But, as has been seen, this language was eliminated before defendant's employment to inspect the pipe.

It seems clear that if defendant were expected to observe such special inspection procedures necessitating the continuous presence of inspectors at the factory, additional compensation would have been necessary. Mr. Getty was doubtless unwilling to authorize any additional charge, as he considered the pipe "terribly expensive" at the quoted price, which was "about double what it should be" (Tr. 1526, 1621, TD–33, D–8). Plaintiff's position in claiming that defendant should have provided these additional services is reminiscent of a client who employs a lawyer to write a deed and then complains later (after a defect comes to light) that no title search was made.

The third point expresses what we have found to be defendant's obligation (with the qualification that inspection of the interior is limited to what can be seen from the ends of the pipe, using a light). The testimony indicates that in fact defendant did perform this duty of making a visual inspection.

Likewise the evidence shows that defendant did participate to the customary extent in witnessing the physical tests, referred to in the fourth point. As to the fifth point, there is no showing that the repair welders at the Castrop plant were incompetent, and the action of the inspectors in marking pipe for repair is adequate performance of their duties in that connection.[13]

The sixth point contends that the inspectors should have controlled the marking of the pipe with the defendant's symbol denoting acceptance and the separation of rejected pipe from accepted pipe so as to prevent shipment of defective material (Tr. 1803, 3729).

The evidence clearly discloses that Castrop employees, not Moody employees, actually put the defendant's mark "ME" on the joints of pipe which the inspectors accepted (Tr. 186–88). Castrop kept the records of pipe which had been accepted (Tr. 121). It is likewise clear that the inspectors took no particular care to exercise surveillance over the custody of accepted or rejected joints in order to make sure that none of the latter were shipped to the Neutral Zone (Tr. 188–89). Indeed, there is some evidence that defendant admitted that joints with skelp welds were shipped notwithstanding rejection by the inspectors (ST–71). The matter of such joints has previously been discussed. No damage was suffered by plaintiff with respect to these joints, even if plaintiff had not authorized their shipment by an arrangement which was *res inter alios acta* insofar as defendant was concerned (Tr. 3897).

At first blush it seemed to us that it was negligent for the inspectors to be so lax and to permit Castrop employees to affix the symbol of acceptance. However, this is another matter with respect to which we conclude that customary practice in the dealings between Crispin and defendant must govern.

There is evidence that it is customary for defendant's practice to be followed (Tr. 186–87). There is good reason for such a practice. Obviously, the inspector's function is to exercise expert judgment, to make the decision whether a particular piece of pipe is to be accepted or rejected. Once that determination is made, it is merely a clerical or ministerial function to dispose of the rejected ma-

---

13. Where a weld bead was too high, the inspectors marked it "grind", and it would be ground down to meet the limit in the specifications (Tr. 113–14, 209). Mr. Piper did not want this to be done (Tr. 1342–43), but his reasons were not set forth in the specifications, and hence the inspectors were justified in passing the pipe if it came within the dimensional limits specified.

terial and to process the acceptable product for shipment.

Basically, the inspector represents the purchaser; and it would not be unusual for a purchaser in a department store, for example, after having made her selections, to rely upon the store's employees to see that the correct articles are delivered and that other merchandise which the customer has examined but rejected is returned to its proper place in the seller's stock. It would be rather unusual for the purchaser to follow the product through the seller's shipping department and accompany it until delivery is completed, as if each stage in its journey had to be accounted for like a murder bullet in its progress through a ballistics laboratory to the courtroom.

If a buyer of pipe in plaintiff's position is insistent that the inspection service include such policing of the movement of the pipe after acceptance or rejection, it is obvious that the number of employees provided by the inspecting firm would be increased and their continuous attendance would be required. It follows that additional (perhaps prohibitive) compensation would have to be paid for inspection. Such increased expense would ordinarily be unnecessary, and the custom of permitting factory employees to handle the mechanical details is not an unreasonable one. It is similar to reliance by lawyers on the accuracy of a court reporter's transcript.

It is not surprising, therefore, that the custom has arisen of permitting inspectors to rely upon the diligence of the manufacturer's employees in carrying out clerical details, when in the judgment and discretion of the inspectors circumstances warrant such reliance. It would seem to be particularly appropriate in the case of a German plant such as Castrop's. The disciplined thoroughness of the German people is notorious. The war crimes trials disclosed with what efficiency and scrupulous documentation even the gruesome tasks of genocide were carried out. Robert H. Jackson, The Nuernberg Case (1947) 35. Doubtless the same precision could reasonably be expected with respect to the shipment of pipe.

### Was Defendant Negligent?

But, as has been previously stated, even if defendant's position is accepted, and we conclude that defendant's duty was merely to make a visual inspection of the customary sort, nevertheless such inspection itself might have been conducted in a negligent manner. What evidence of defendant's negligence did plaintiff submit?

Two types of evidence are to be noted. In the first place, plaintiff offered circumstantial evidence as to the number of days and number of hours spent at the Castrop plant by defendant's inspectors, the number of pieces of pipe reportedly inspected, and suggests that an inference be drawn that there was not enough time to have properly inspected all the pipe which was accepted and rejected by the inspectors. This evidence doubtless suffices as a scintilla, and possibly a jury could find negligence upon that type of evidence.

But there is a second type of evidence from which we think a jury might more readily draw an inference of negligence. This is the testimony of various well-informed witnesses to the effect that external inspection of the exterior of the weld seam would have disclosed signs which to the trained inspector's eye were indicative of defects within.

This point was made by a number of plaintiff's witnesses (Piper, Tr. 1496; Ronay, Tr. 1752, 1786, 1814–15, 2115; Lincoln, Tr. 1157, 1162, 1231; Gordon, Tr. 3095; McCauley, Tr. 3740–42, 4439, 3736–37, also 3185, 3187, 3619, 3622, 3641, 3678, 3688), but was also conceded by defendant (Tr. 704) and by Leibold (Dep. 223).

Apparently, from this testimony, a high narrow weld bead is indicative of poor penetration and possible lack of fusion. As one witness described the situation, the arc puddle or "pool tends to be somewhat roughly hemispherical, so you can't get a very deep pool without

getting wide" (Tr. 1231). Hence a high narrow bead is a warning sign (Tr. 1157–58).

Consequently, we conclude that there was enough evidence of negligence to go to the jury, if the case were one assigned for jury trial.

### Weight of the Evidence

However, in the case of the instant motion, which is made under F.R.Civ.P. rule 41(b), 28 U.S.C., the Court's function is not exhausted by finding that plaintiff's evidence is sufficient to withstand a demurrer. The rule further provides that:

> "In an action tried by the court without a jury the court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff the court shall make findings as provided in Rule 52(a)."

See O'Brien v. Westinghouse Electric Co., 293 F.2d 1, 9 (C.A.3, 1961).

While it might be more judicious to await the completion of defendant's case before attempting the weigh the evidence for the purpose of fact-finding, and it was our original thought at the conclusion of plaintiff's case that such a course should be pursued, nevertheless as we read the transcript and examined the exhibits, we have been impressed with a growing conviction that if we are not now convinced by the strength of plaintiff's case, it is unlikely that defendant's evidence will have the effect of bettering plaintiff's case (although that often occurs in the course of a trial). Here, however, it has become apparent that defendant's expert witnesses have sat in the courtroom during the trial, and presumably conducted scientific tests of their own, and there is no reason to suppose that defendant's presentation would add materially to the strength of plaintiff's case.

It therefore seems inadvisable to embark upon another three-month period of taking voluminous testimony, which would postpone further the parties' opportunity to test on appeal the trial Court's rulings as to the admissibility of evidence. Assuming, as we now do, that our rulings were correct and that the evidence which we have received was admissible, we conclude that there was enough evidence of defendant's negligence to warrant submission of the case to a jury if there were one. If, however, our rulings on evidence were wrong, a consequence would be that perhaps there is not enough evidence to go to the jury. But even if we are right in holding that the trier of fact has sufficient evidence available upon which to bottom a finding of negligence, that does not mean that as finder of the facts, under Rule 41(b) in a case without a jury, we are actually ourselves convinced that such negligence exists. In fact the opposite is the case.

At first the feeling is hard to resist that so extraordinary an event as the breakdown of plaintiff's pipe line must be due to negligence somewhere. Yet basically, when analyzed from the legal standpoint, this colossal catastrophe is nothing more than proof of the occurrence of an accident. This, under well-known Pennsylvania law, does not fasten liability upon a defendant. Lear v. Shirk's Motor Express Corp., 397 Pa. 144, 149, 152 A. 2d 883 (1959); Lanni v. Pennsylvania R. R. Co., 371 Pa. 106, 109, 88 A.2d 887 (1952). Plaintiff must prove that *defendant* was negligent, and that such negligence was the proximate cause of plaintiff's injury.

Under our interpretation of defendant's contract with Crispin, defendant is liable only for negligent visual inspection. Plaintiff must therefore prove, not merely that there were defects in the pipe, but that such defects were ascertainable in the normal course of the ordinary visual inspection of the exterior of the pipe. We are not convinced that this has been established.

Perhaps if Castrop were being sued for failure to comply with the specifications, a different picture would be presented. A cablegram to Castrop from its engineer

Torspecken, dated November 11, 1957, says "Schweisse sehr schlecht" ["welds very poor"]. (To–4).

The clearest explanation of the causes of the breakdown in the pipe line is given in a letter from Mr. Getty to W. J. Scott, dated December 24, 1957 (D–61):

"I had a long conference on Saturday with Torspecken. He stated that when the mill got the order for this pipe, they didn't know who it was for, or whether it was for oil or water use. They got the order from the Crispin Company, and didn't know until much later that it was for Getty Oil Company.

"They have three grades of pipe —the grade they sent us, which is plate with 20% elongation, welded on the outside only; second, the same plate but welded outside and inside; and third, better plate, welded outside and inside. The double weld costs only $5 per ton more than the single weld. The better plate costs $10 per ton more. The double weld with the better plate will hold 2,000 lbs. He said the poor welding in our pipe was probably due to a deffect [sic] in one of the welding machines. Nevertheless, even with this poor welding, every joint held 1000 lbs. pressure for 5 minutes. The weld penetration should be 6 or 7 mms; due to the deffective [sic] welding machines, the penetration was sometimes only 3 mms. Nevertheless the strength of this 3 mms. is enough to hold 1000 lbs.

"The pipe was roughly and improperly handled in the field, and the engineering in the line was conspicuous by its absence. The design and spacing of the sleepers was completely faulty. Hartley and Torspecken agreed on this. Due to the handling and the stressing that the pipe received, particularly in putting it on and taking it off the sleepers, a large number of ruptures occurred. These ruptures took place nearly always in sub-standard joints. I have seen one photograph of a rupture which also split the place. Had all of the pipe been properly welded, we would have had very little trouble in spite of the rough handling and poor engineering. It is, of course, too bad that the pipe doesn't have better plate and welding both inside and out. If this were the case, we could test the line to 1500 lbs.

"Torspecken wants us to test the present line to 850 lbs. for 24 hours. He thinks the joints that will collapse through poor welding, at 850 lbs. are relatively few in number, and once they have been located and repaired and replaced, there should be no more ruptures due to poor welding. Additional ruptures would be due to expansion and contraction, and if the line is properly engineered, contraction and expansion can be taken care of."

In a subsequent letter of February 20, 1958, to a Castrop representative (D–80) Mr. Getty writes:

"Your people claim, I understand, that the line will hold an 850 lb. test pressure on a 24-hour test of the entire length, and operate satisfactorily at 600 lbs. pump pressure provided expansion joints are installed every half-mile. If you promptly furnish us with the necessary 50 expansion joints, at your own expense, and supervise their installation, we will install them and test the line under the supervision of your engineers at 850 lbs., 24-hour test.

"We assume that after these expansion joints are installed there will be not more than 6 ruptures and 25 leaky places. We cannot expect to spend the rest of our lives patching ruptures and leaks in your defective welds. As a result of your defective linepipe we are still without the pipeline, and we have suffered many millions of dollars in damages and expenses due to the failure of your linepipe to meet the specifications.

"If the line, after the installation of the 60 expansion joints, operates satisfactorily at 600 lbs. pump pressure without further ruptures and leaks aside from the above-mentioned 6 ruptures and 25 leaky spots, and provided the 50 expansion joints are shipped within the next few weeks, we will accept the pipe even though it does not meet the specifications.

"If, however, the pipeline does not operate satisfactorily at 600 lbs. pump pressure, we will have to request you to promptly replace the entire line at your expense."

It is not clear whether the Castrop representatives ever in fact made a successful test in compliance with Getty's proposal (See Tr. 2806, 3074–75, 3108–9, 3119–21, 4499–4500; D–79–28; D–79–35; D–83).

As plaintiff concedes,[14] defendant is not liable as an insurer for the manufacturer's compliance with specifications. Defendant is liable only for his own negligence in inspection. Failure to discover defects which did not appear on external inspection would not constitute negligence. That such defects, not discoverable by means of ordinary careful inspection, were likely to be in fact present in single-pass spiral-welded pipe was clearly brought to plaintiff's attention by defendant (ST–11). Defendant also pointed out that API–5L standards for pipe did not permit spiral-welded pipe or pipe made by the submerged-arc welding process. Nevertheless plaintiff proceeded to order pipe of that kind, which the testimony shows is not used for any other high-pressure oil transmission pipe line than the ill-starred Getty pipe line (Tr. 1431 [Piper]; 2264 [Lattan]; 1209 [Lincoln]; 1722 [Ronay]; 2408 [Scott]; 3749–50 [McCauley]; 1431 [McNair]).

Moreover, plaintiff did not make known either to the manufacturer or to defendant what the pipe was to be used for, although this is an important considera-

tion (Tr. 2263). It is clearly established that it is possible, although improbable, to produce single-pass pipe with full penetration (Tr. 1183, 1703, 2244–45, 3742, 4143); and that double-pass pipe is better, but costs more (Tr. 1205, 1699). In fact Mr. Piper tried to get double-pass pipe. It is also significant that the change of dimensions from 16 to 18 inch was made, apparently by Mr. Getty, without consulting Mr. Piper (Tr. 1517, 1673–74; ST–46). The decision to nest $10\frac{3}{4}$ inch pipe in the 18 inch pipe to save freight was also made without technical advice, and may have weakened the larger pipe in handling. There is a considerable amount of evidence indicative of the fact that expansion and contraction due to temperature changes would exert stress on spiral-welded pipe from which seamless or longitudinally welded pipe would be free. (Tr. 4250). In short, there are so many intervening factors which may have affected the serviceability of the pipe that it is impossible to be reasonably certain that the damage is attributable to defects which were visible to defendant upon visual inspection of the exterior of the pipe.

It may well be true that under Pennsylvania law the life history of a defective product need not be proved, in order to hold the manufacturer liable. Tomao v. A. P. DeSanno & Son, 209 F.2d 544, 545 (C.A.3, 1954). Yet the more recent cases seem to indicate that strict proof of causation is required; and apparently it is considered necessary to join as defendants the subsequent handlers in order to make the doctrine of exclusive control apply. Here, however, it cannot be claimed that defendant had exclusive control (or any control at all), and hence plaintiff is in the position of one who has merely proved the happening of an accident. Loch v. Confair, 372 Pa. 212, 216–18, 93 A.2d 451 (1953); Braccia v. Coca-Cola Bottling Co., 398 Pa. 386, 387–88, 157 A.2d 747 (1960); Ucci v. Keane, 402 Pa. 467, 471–72, 167 A.2d 147 (1961).

14. Plaintiff's Answer to Defendant's Supplemental Memorandum, p. 2.

A significant shortcoming in plaintiff's case, insofar as persuading the trier of fact is concerned, is the absence of testimony of witnesses from the commercial pipe inspection industry showing what practices are in fact customary in making an ordinary visual inspection of pipe. No such witnesses were produced. There was no proof regarding what services would be customarily rendered for the compensation defendant received. Plaintiff did outline an impressive program of inspection which laboratory welding experts such as Ronay and McCauley considered desirable. They showed what inspectors ought to do in order to maximize the likelihood of obtaining a satisfactory product; but they did not prove what in fact commercial inspectors engaged in the line of work defendant is engaged in do do ordinarily when conducting an inspection of the type which defendant had contracted with Crispin to perform. Nor was it shown that such a program as plaintiff's witnesses outlined was economically feasible for the compensation of $2 per ton which defendant received.

Another notable lacuna in plaintiff's case is any quantitative demonstration of the consequences of defendant's alleged negligence. Suppose it were shown that a certain number of joints of pipe were negligently inspected by defendant; would defendant be liable for all the damage claimed by plaintiff? Apparently plaintiff contends that defendant's negligent inspection is responsible for *all* pipe failures experienced in the line. Defendant seems to contend that plaintiff must show that *all* pipe which defendant inspected was negligently inspected before defendant could be held liable. In our view neither of these positions is correct. Plaintiff could recover, if one joint of pipe were negligently inspected, such and only such damages as could be proved to have resulted as a consequence of the negligent inspection of such joint.

Assuming the existence of defects which arose at the time of manufacture, and assuming further that such defects should have been detected by defendant, plaintiff should still have shown the extent of such defects by more specific proof than the generalities of Professor McCauley who rode once along the pipe line during his three-day stay in the Neutral Zone. Some sort of statistical sampling process, if not an arithmetical count of observable defects, should have been utilized. Witnesses undertook to state that conditions they described were "typical" of the whole line, but a more convincing demonstration could have been made by quantitative data. We agree with defendant's argument that neither the McNair samples nor the McCauley samples sufficed to prove that a "typical" condition existed. They were admitted by the trial Court, however, to prove whatever they did prove, namely that some pieces of pipe did have certain defects (Tr. 2055).

It is impossible to avoid concluding that plaintiff undertook to pioneer in the use of a new type of pipe for oil transmission, and that its unfortunate experience must be considered as part of the cost of progress in the development of new techniques. That the effort was not attended with success and profit in this instance is one of the unhappy events that illustrate the truth that the free enterprise system, which often rewards risk-taking with profit, deals out losses also upon occasion. The principle *res perit suo domino* indicates that plaintiff must bear the loss arising from this experimentation, rather than pass the burden to defendant, who vainly warned plaintiff of the perils involved.

Mr. Getty used a striking simile in the above-quoted letter of February 20, 1958 (D–80): "So to speak, GETTY OIL COMPANY ordered a healthy three-year old thoroughbred horse, and received a 15 year old sickly donkey!" It might also be thought that perhaps a horse had been purchased for work where a camel or elephant would have been more appropriate.

Another factor in defendant's favor when the weight of the evidence is considered is the unwillingness of Mr. Getty

to testify. The evidence shows that he made many decisions himself regarding the pipe, rather than delegating responsibility to subordinates. The inference must therefore be drawn, in any doubtful matter, that his testimony would not be favorable to plaintiff's contentions. The same rule applies to plaintiff's practice of furnishing to defendant's counsel copies of copies of documents rather than the originals, which might disclose annotations unfavorable to plaintiff's contentions.

Accordingly, we find that plaintiff has failed to establish that its losses are attributable to defendant's negligence. We find that defendant performed its duties of visual inspection in the usual and ordinary manner customary in the industry, and with due care under the circumstances.

This opinion shall be deemed to embody findings of fact and conclusions of law in accordance with F.R.Civ.P. Rule 52. We proceed to make the following special findings called for by Rules 41(b) and 52(a).

### Findings of Fact

1. Plaintiff, Getty Oil Company, is a Delaware corporation.

2. Defendant, Peter A. Mills, is a citizen of Allegheny County, Pennsylvania, doing business as Moody Engineering Company.

3. Plaintiff, through a series of intermediaries, placed an order of "line pipe" to be produced by a manufacturer in Germany.

4. The Crispin Company of Houston, Texas, the penultimate intermediary, employed defendant to inspect the pipe, pursuant to a letter dated November 28, 1956, stating "We would appreciate your performing the inspection of this material in accordance with the specifications of the order and preparing your certificate in sextuple."

5. Defendant had previously performed numerous inspection jobs for Crispin. Such jobs involved visual inspection of the finished product, rather than continuous policing or control of the production process.

6. It was customary for inspectors on such jobs to permit some of the procedures to be performed by employees of the manufacturer.

7. Plaintiff did not inform the manufacturer or defendant what the pipe was to be used for.

8. Because it was available, plaintiff bought spiral-welded single-pass pipe manufactured by the submerged arc process.

9. Such pipe is not used for high-pressure oil transmission lines. It is not recognized by the standards of the American Petroleum Institute, API-5L.

10. Such pipe is likely to be less satisfactory than double-pass pipe, by reason of the probability of the lack of full penetration, although it is physically possible to manufacture single-pass pipe with full penetration.

11. Such lack of penetration occurs at the root of the weld, on the inside of the pipe, and cannot ordinarily be detected by visual inspection except within a short distance from the ends of the pipes where inspectors can look in with a light.

12. Defendant warned plaintiff of the danger of such concealed defects due to lack of penetration in single-pass pipe.

13. Spiral-welded pipe is subject to stress from expansion and contraction due to temperature changes to which seamless and longitudinally welded pipe are not subject.

14. Defendant, through experienced and competent employees, made a careful inspection of the pipe here involved, exercising due care in accordance with the customary standards prevailing in the industry and in accordance with the custom established in previous inspections for Crispin.

15. After the pipe had been inspected by defendant it was transported by rail,

ship, and truck to the pipe line site in the Neutral Zone, and was fabricated into a pipe line. During the course of transportation and construction it was subject to handling which may have weakened the pipe.

16. Plaintiff utilized no engineering advice or preliminary designing in constructing the pipe line.

17. Numerous leaks and ruptures, occurring in the spiral-welds, made the pipe line unserviceable.

18. Subsequent laboratory tests indicated that there was lack of penetration, lack of fusion, and other defects in many of the spiral welds.

### Conclusions of Law

1. This Court has jurisdiction of the cause and of the parties thereto.

2. Defendant is not liable to plaintiff under any theories of fraud or deceit, or third-party beneficiary to a contract.

3. Defendant's liability for tort is governed by the law of Pennsylvania, including its conflicts rules, and hence by the law of West Germany.

4. Defendant was not negligent in performing the inspection and is not liable to plaintiff in tort.

5. Plaintiff's loss was due to numerous factors, including its own acts and voluntary decisions, and plaintiff has not met the burden of proof nor shown that its loss was proximately caused by any negligence of defendant.

6. Witnesses offered by plaintiff who were familiar with welding in boilers and naval construction or in gas pipes, are competent to testify as experts regarding welding in pipe for oil transmission, the weight of their testimony being for determination by the trier of fact.

The motion to dismiss is granted and the Clerk is directed to enter judgment for the defendant.