**BOWMAN STEEL CORPORATION, successor by merger to American Steel Band Company, a Pennsylvania corporation, Plaintiff,**

v.

**LUMBERMENS MUTUAL CASUALTY COMPANY, an Illinois corporation, Defendant.**

**Civ. A. No. 63–1073.**

United States District Court
W. D. Pennsylvania.

Aug. 26, 1965.

V. C. Short, Kirkpatrick, Pomeroy, Lockhart & Johnson, Pittsburgh, Pa., for plaintiff.

Wallace E. Edgecombe, Royston, Robb, Leonard, Edgecombe & Miller, Pittsburgh, Pa., for defendant.

DUMBAULD, District Judge.

There used to be people holding themselves out as transportation consultants who would solicit a large shipper for permission to audit his freight bills, and would then have him sue the carriers for overcharges under applicable tariffs, taking for their compensation a contingent percentage of the recovery.

The present litigation seems to owe its origin to a similar display of zeal and ingenuity on the part of an insurance brokerage firm (Johnson & Higgins), successfully "bucking" for plaintiff's account. The idea that the defendant insurance company might be liable under the policy issued to plaintiff apparently never occurred to plaintiff's former insurance adviser who lost the business to the more adventurous firm. The amount of money recoverable if successful would make it worth while to attempt collection, even if the law were less clearly in favor of defendant than it is. For that the magnitude of the financial interests at stake is potent to foment litigation has been aptly observed by Lord Coke and Justice Holmes. 10 Rep. pref.; Northern Securities Co. v. United States, 193 U.S. 197, 400–401, 24 S.Ct. 436, 48 L.Ed. 679 (1904); Sanitary Dist. of Chicago v. United States, 266 U.S. 405, 425, 45 S.Ct. 176, 69 L.Ed. 352 (1925). See Getty Oil Co. v. Mills, 204 F.Supp. 179, 180 (W.D.Pa.1962).

The case is before us on defendant's motion for summary judgment, raising questions of law as to the scope of coverage under the policy. From the affidavits, depositions, and other voluminous material developed during extensive discovery procedures, the following facts emerge.

Plaintiff, Bowman Steel Corporation, is the corporate successor by merger to a subsidiary manufacturing company which manufactured a product named "Steelbestos" which was sold by the parent sales company to numerous customers to be used as an exterior surface for buildings. The product, as the name indicates, was made of layers of steel and of asbestos, bonded together by a layer of adhesive material. In due course after the sales, complaints were received from many customers that the material was defective. Some complaints were of discoloration, most that the material was "delaminating" or peeling apart. Ultimately the product was determined to be so unsatisfactory that plaintiff ceased producing it.

Upon receipt of these complaints from customers, plaintiff undertook "on its own hook" to adjust the matter, installing new material to replace that which had proved defective. No demand on defendant was made, and defendant was given no opportunity to investigate or settle the claims of customers. Because of its extensive operations in the process of making replacements, the parent sales corporation negotiated with defendant's agent an adjustment of insurance rates, because it was now functioning as an operating company as an installer of material rather than simply as a sales company.

Plaintiff replaced defective material for 56 customers, on contracts approximating $1,094,010.00, incurring expenses of approximately $416,786.00.

If it were determined that defendant is liable on the policy, there would be enormous questions of fact regarding the extent and amount of damages arising out of these numerous product failures. There would also be questions of fact as to how much of the replacement work done by plaintiff was work for which plaintiff was responsible under the warranties imposed on it by law as a seller, and how much was volunteered by plaintiff as a matter of sales policy or promotion of good customer relations. There is substantial evidence that some of the replacement work fell in the latter category.

Defendant contends that it is not liable under the coverage of the policy. It further contends that plaintiff can not recover because of failure to comply with the terms of the policy by giving notice to defendant when claims arose.

Plaintiff concedes that under the policy exclusions it can not recover for the value

of the defective material itself which was replaced. But plaintiff seeks to recover the large expenses for labor and other costs of making the replacements.

The policy provides that the defendant agrees "*Coverage D—Property Damage Liability—Except Automobile.* To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident."

Under exclusions, it is provided: "This policy does not apply: (a) to liability assumed by the insured under any contract or agreement except under coverages B and D, (1) a contract as defined herein or (2) as respects the insurance which is afforded for the Products Hazard as defined, a warranty of goods or products."

"* * *

(j) under coverage D, to injury to or destruction of (1) property owned or occupied by * * * the insured, or * * * (4) any goods, products or containers thereof manufactured, sold, handled or distributed * * * by the named insured, or work completed by or for the named insured, out of which the accident arises."

Under definitions, it is provided:

"(g) *Products Hazard.* The term 'products hazard' means

(1) goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, if the accident occurs after possession of such goods or products has been relinquished to others by the named insured or by others trading under his name and if such accident occurs away from premises owned, rented or controlled by the named insured or on premises for which the classification stated in division

(A) of the declarations excludes any part of the foregoing; provided, such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, rented to or located for use of others but not sold;

(2) operations, if the accident occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the named insured; provided, operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; provided further, the following shall not be deemed to be 'operations' within the meaning of this paragraph: (a) pick-up or delivery, except from or onto a railroad car, (b) the maintenance of vehicles owned or used by or in behalf of the insured, (c) the existence of tools, uninstalled equipment and abandoned or unused materials and (d) operations for which the classification stated in division (A) of the declarations specifically includes completed operations."

Under conditions, it is provided:

"10. *Notice of Accident.* When an accident occurs written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place and circumstances of the accident, the names and addresses of

the injured and of available witnesses."

"11. *Notice of Claim or Suit*. If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

\*    \*    \*    \*    \*    \*

"13. *Action Against Company*. No action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company."

The insured is named as

"(1) American Steel Band Company
(2) Bowman Steel Corporation
(3) Allegheny Steel Band Company".

A printed endorsement provides "It is agreed that the policy does not apply to the products hazard as defined therein" but a typed endorsement reads: "This endorsement does not apply to: American Steel Band Company".

Thus only if the manufacturing company is liable can plaintiff, the successor corporation, recover, as the products liability provision of the policy covered only that one entity. Product sold by that company to the parent company was sold only under the general warranty imposed by law under the Uniform Sales Act or its successor statute. (Ans. 4 to Interrogatories). Liabilities of the parent sales corporation would not be covered at all by the policy.

From the foregoing it is clear that an amount to be recoverable under the policy must be (1) *damages* (2) to *property* (3) for which the plaintiff is legally *liable* (4) as the result of *accident*.

Under exclusion (j), the "property" must be that of someone other than plaintiff itself.

This is a "public liability" policy, in the same terms as the usual automobile policy. (In fact, this policy in coverages A and B covers liability incurred by reason of operation of motor vehicles.)

But it also covers *liability* in the nature of "products liability" when *damage* is caused under the "products hazard" for which plaintiff is liable under a warranty imposed on it by law as incident to the sale of plaintiff's products.

The cases seem to show that an insurer is liable under such a policy if the product failure causes extrinsic damage to the purchaser (or other third parties). But there is no liability for the mere failure to obtain the anticipated advantages derived from the ownership of the purchased article. The seller may be liable for breach of warranty for failure to furnish what he bargained to, but this is not *damage*. By way of illustration, the insurer would not be liable if a stud horse merely were found impotent, but would be liable if the horse were so infirm that it collapsed and injured the buyer's barn or mares. So here, if the defective material had fallen from the walls of the building and struck someone, the insurer would be liable for such *damages*. But for the mere failure of the goods sold to serve its purpose the insurer is not liable.

These conclusions are based upon our reading of the leading cases cited by both sides as governing the issue here: Pittsburgh Plate Glass Co. v. Fidelity and Casualty Co., 281 F.2d 538, 541 (C.A. 3, 1960); Bundy Tubing Co. v. Royal Indemnity Co., 298 F.2d 151, 153 (C.A. 6, 1962); Hauenstein v. St. Paul Mercury Indemnity Co., 242 Minn. 354, 65 N.W.2d 122, 126 (1954).

In Pittsburgh Plate Glass, defective paint peeled off outdoor Venetian blinds, exposing them to rust. In Bundy, a defective heating system of pipes imbedded in a concrete floor necessitated removal and replacement of concrete. In Hauen-

stein, defective plaster injured the walls. In all of these cases, there was injury or damage to the customer's extrinsic property, not merely expenses incidental to replacement of the defective article itself. In the case at bar there was (except in one instance which defendant handled) no damage to buildings or other property extrinsic to the defective product itself and plaintiff is seeking to collect merely for the expenses incidental to such replacement.

It seems like jesuitical sophistry to contend, as plaintiff does, that defendant is liable under the "loss of use" provision of the policy for depreciation in the value of plaintiff's customers' buildings by reason of the defects of the materials installed thereon.

Theoretically no doubt there could be calculated an infinitesimal diminution in the value of a customer's building at the time the installed siding ceases to be a marketable product and becomes a defective product. Plaintiff's workmen replacing it would also (if their presence was not permissive) be trespassers, and it would be possible to compute the rental value of the premises used and occupied by these workmen, of the use of which for its own manufacturing purposes the customer would be deprived. (Just as the French government, according to G.I. gossip, charged rent for the trenches occupied by American troops during the war). But this would seem a clear case for application of the maxim *de minimis non curat lex*. The mere presence of workmen *replacing the exterior surface* of a building, and not depriving the customer of the effective use of the building and not interfering with the customer's normal use of the building for his own business, is surely not compensable under a "loss of use" clause in the policy. Nor is there "damage" to property merely because it is temporarily worth a little less while equipped with worthless siding than it would be if the siding were satisfactory.

Our conclusions on the issues of coverage dispose of the case. By way of dictum it may be added that defendant appears to have a good defense also on the ground of failure to make a demand and give notice so that defendant could investigate claims and control the settlement, as contemplated by the policy.

Plaintiff contends that these provisions of the policy are waived by knowledge attributable to the defendant by reason of plaintiff's discussions with one Knox M. Young, defendant's sales agent, who signed the policy on behalf of defendant and also acted as plaintiff's insurance "adviser" until replaced by the more eager beaver agency which perceived the possibility of holding defendant liable in this litigation.

Whether Young did anything more than any salesman should in tailoring his available wares to the customers' needs or whether he occupied a position of conflicting interests which would have been unethical if he had been a lawyer, what knowledge he really had, and whether he was an agent or a broker and what consequences flow from such status, need not concern us now. Young in his deposition [pp. 15–17] denies all knowledge of discussions about the problem of product failure.[1] But plaintiff merely alleges [par. 5, Boyd affidavit] that the "problem" was "discussed" with him, not that any allegation of liability was advanced or demand made upon the insurance company. The situation may well have been discussed merely in the context of plaintiff's rate adjustment to cover the replacement operations as an

[1]. Whether this loss of memory is simply a consequence of his loss of plaintiff's business need not be probed. His indifference to plaintiff's plight may be akin to the response of the exiled Dutch jurist Hugo Grotius, after he had become Swedish ambassador, when he learned that the scholarly Englishman John Selden was attacking the doctrine of freedom of the seas which Grotius had defended in his Mare Liberum published in 1609. "Respondeant Batavi. Ego nunc Suedica curo". Dumbauld: "Hugo Grotius: The Father of International Law", 1 J.Pub.Law (1952) 117, 133.

operating company rather than a sales company.

In any event, mere knowledge of facts, without any semblance of a claim under the policy, would not charge Knox (even if he were regarded solely as an agent of defendant) with the duty of notifying the insurance company of the situation any more than it would require a policy-holder to give such notice. Ripepi v. American Insurance Cos., 234 F.Supp. 156, 159–160 (W.D.Pa.1964), aff'd July 20, 1965, 3 Cir., 349 F.2d 300.

It therefore seems that whatever fact issues regarding Knox's knowledge may be in dispute are not material to the case.

Accordingly, defendant's motion for summary judgment must be granted.